IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

OCT 09 2015

DOUGLAS F. YOUNG, Clerk
By _____ Deputy Clerk

COOLING & APPLIED TECHNOLOGY, INC.                    PLAINTIFF

V.                        CASE NO. 15-2211

MORRIS & ASSOCIATES, INC.                            DEFENDANT

## COMPLAINT

Plaintiff, Cooling & Applied Technology, Inc., for its complaint against
Defendant, Morris & Associates, Inc., states:

### PARTIES

1.     Plaintiff Cooling & Applied Technology, Inc. ("CAT") is an Arkansas
corporation with its principal place of business in Russellville, Arkansas.

2.     Defendant Morris & Associates, Inc. ("Morris") is a North Carolina
corporation with its principal place of business in Garner, North Carolina.  Morris is
registered to do business in Arkansas and does business in Arkansas, including in
this District.

### JURISDICTION AND VENUE

3.     This is an action for unfair competition under the Lanham Act,
Arkansas common law unfair competition, false marking under the Patent Act,
violation of the Arkansas Deceptive Trade Practices Act, and violation of the North
Carolina Unfair and Deceptive Practices Act.  The Court has subject matter
jurisdiction over the federal law claims pursuant to 28 U.S.C. § 1331.  The Court

has subject matter jurisdiction over the state law and common law claims pursuant to 28 U.S.C. § 1367.

4.    This Court has personal jurisdiction over Morris because it does substantial business in this forum, including advertising, offering for sale, selling, installing, and servicing goods in Arkansas and in this District.  Morris is also registered to do business in Arkansas and has a registered agent for purposes of accepting service of process in Arkansas.

5.    Venue is proper in the Western District of Arkansas pursuant to 28 U.S.C § 1391(b)-(c).  Morris's false and misleading advertising has been and continues to be directed to CAT and Morris's mutual customers, including Tyson Foods, Inc. and other poultry processing companies who are headquartered and/or operate facilities in this District.  Thus, a substantial part of the events giving rise to CAT's claims arose in this District.  Venue is also proper because Morris is subject to personal jurisdiction in this District.

## BACKGROUND FACTS

6.    Since 1997, CAT has been manufacturing and selling equipment for the food processing industry in the United States and abroad, including chillers and other equipment for use in poultry processing.  CAT chillers are custom and highly-engineered pieces of equipment.

7.    CAT and Morris are the only two poultry chiller manufacturers in the United States.  CAT and Morris share many of the same customers and are direct competitors in this market.

8.     In the processing of poultry for human consumption, it is necessary that warm poultry carcasses be chilled as rapidly as possible to reduce the risk of bacterial contamination.  This required chilling typically occurs in a series of chillers.  One type of chiller is an auger chiller, which includes a spiral auger mounted in a tank holding chilled water.  The rotation of the auger moves the poultry carcasses through the chilled water bath from one end of the chiller to the other.  Chillers often also include antimicrobial agents that aid in reducing bacteria.

9.     The processing lines of poultry processing plants are closely monitored and highly regulated by the federal government (e.g., Food Safety and Inspection Service (FSIS) of the United States Department of Agriculture (USDA)), including chiller operations and equipment sanitation.  For example, USDA inspectors are on-site at poultry processing plants during operation.

10.     Morris markets and advertises a variety of chillers and other processing equipment through its website, www.morris-associates.com, and marketing brochures.  Upon information and belief, the content of the website and marketing brochures is created, approved, and disseminated from Morris's headquarters in North Carolina.

11.     Morris advertises and sells processing equipment to poultry processing companies throughout the United States.  Upon information and belief, Morris's marketing and advertising efforts, including its website and marketing brochures, are directed to its customers and prospective customers in North Carolina, Arkansas, and elsewhere around the United States.

## A. *INTRAGRILL* AUGER

12.    Morris is the owner by assignment of U.S. Patent No. 6,308,529 ("the '529 patent"), which is entitled "Poultry Chiller with Open Auger" and issued on October 30, 2001.  The '529 patent is attached as Exhibit A.  The '529 patent describes an auger-type poultry chiller having a series of auger blade segments which overlap one another and create water passages.  The water passages are positioned to allow water flow laterally across the shaft of the auger from the right side of the chiller to the left side, or vice versa, as shown in Fig. 5 of the '529 patent and reproduced below:



*Fig. 5*

13.    Figure 4 of the '529 patent illustrates the positioning of the water passages relative to the shaft of the auger and is reproduced below:



14.  The '529 patent includes two independent claims: claim 1 and claim 13.

15.  Claim 1 of the '529 patent claims:

A chiller for reducing the temperature of previously eviscerated oven-ready whole birds and the like, comprising:

a tank having first and second opposed ends and defining a water reservoir between said ends;

water fill means for introducing water in said reservoir at a first end of said tank and draining water at a second end of said tank and forming a movement of water generally from said first end toward said second end of said tank;

an auger in said tank extending between said first end and said second end of said tank, said auger including an auger shaft and a helical blade structure mounted to and extending about said auger shaft, said helical blade structure defining therein water passages for passing water from one side to the other side of said blade structure said water passages extending radially from said auger shaft and facing approximately tangentially of said auger shaft and moveable with said auger in a rotary direction away from the birds in the tank;

power means in driving relationship with said auger and arranged to rotate said auger about an axis of rotation in a rotary direction to urge birds from said second end toward said first end of said tank and to move said water passages of said auger in a rotary direction away from the birds in said tank so that the birds do tend to not pass through said water passages of said auger;

whereby the birds are urged in one direction by the auger from the second end of the tank toward the first end of the tank as the water flows in the tank through the water passages of the auger blade in a counter flow direction.

16.    Claim 13 of the '529 patent claims:

A chiller for reducing the temperature of previously eviscerated oven-ready whole birds and the like, comprising:

a tank having a first and second opposed ends and defining a water reservoir between said ends;

a water circulation system for introducing water into said tank at said first end of said tank and draining water at a second end of said tank and forming a movement of water generally from said first end toward said second end of said tank;

an auger in said tank extending between said first end and said second end of said tank, said auger including an auger shaft and a helical blade structure mounted to and extending about said auger shaft, said helical blade structure formed in segments extending along said shaft with adjacent segments overlapping one another and forming water passages facing approximately tangentially of said auger shaft for passing water between said segments of said helical blade structure; and

power means in driving relationship with said auger and arranged to rotate said auger about said auger shaft to urge birds in the water from said second end toward said first end of said tank and to move said water passages of said auger in a rotary direction away from the birds in said tank, so that the birds tend to not pass through said water passages of said auger.

17.    The '529 patent describes that the water passages face tangentially of the auger shaft "as opposed to axially of the auger."

18.    Upon information and belief, sometime in the early 2000's Morris began marketing auger chillers with the new auger design described in the '529 patent, which it called the "Integrill" auger.  Morris's marketing and advertising

efforts included creating and disseminating brochures showing and discussing the benefits of the Integrill auger. Morris's marketing brochures identified the Integrill auger as being patented. Below is a photograph of the Integrill auger included in Morris's marketing brochure:



19.     Sometime thereafter, Morris changed its Integrill auger design. Morris also began referring to the auger design as the *IntraGrill* (as opposed to Integrill) auger. Around September 2014, Morris created and began disseminating through its sales representatives and its website a brochure promoting the *IntraGrill* auger. The September 2014 marketing brochure is attached as Exhibit B. Below is a photograph of the auger included in the September 2014 marketing brochure:



20.     Instead of the water passages being positioned to allow water flow laterally across the shaft of the auger like described in the '529 patent and shown in the Morris marketing brochure promoting the "Integrill" auger, the new *IntraGrill* auger has water passages in the faces of the auger to allow water flow in the same direction as the length of the shaft of the auger, as indicated by reference numeral "3" shown in Morris's September 2014 marketing brochure and reproduced below:



21.     Morris's *IntraGrill* auger is not covered by any of the claims of the '529 patent at least because the water passages of the *IntraGrill* auger are not facing approximately tangentially of the auger shaft as required by all of the claims and because the *IntraGrill* auger does not include a helical blade structure formed in segments extending along the shaft with adjacent segments overlapping one another as required by claim 13.

22.     Morris's *IntraGrill* auger is not covered by any of the claims of any other patents owned by Morris.  Morris's *IntraGrill* auger therefore is not patented as claimed by Morris.

23.     A side-by-side comparison of Figure 4 of the '529 patent (left), the original Integrill auger (middle), and the current *IntraGrill* auger (right) is shown below:

  

24.     Despite the change in the positioning of the water passages relative to the shaft of the auger and the deviation from the claims of the '529 patent, Morris has continued to market the *IntraGrill* auger to its current and prospective customers as being patented.

25.     The two-page September 2014 marketing brochure identifies the *IntraGrill* auger as being patented in five different places.

26.     In addition to the September 2014 marketing brochure, Morris falsely states on its website that the *IntraGrill* auger is patented, as shown below:



27.   CAT markets and sells a competing auger design in its poultry chillers. The CAT auger includes "water flow reliefs," which are openings that allow water in the chiller to flow through the faces of the CAT auger and in the direction of the length of the shaft of the chiller. The "water flow reliefs" prevent the damming of water in the chiller that can be caused by the large number of poultry carcasses in the tank, which can substantially impact the rate of cooling of the poultry carcasses.

28.   Morris's website also includes a comparison of the *IntraGrill* auger and CAT's auger with "water flow reliefs." A page from Morris's website is attached as Exhibit C. CAT's distinctive "water flow reliefs" are shown in the auger depicted on Morris's website. The auger therefore has been and will continue to be recognized as CAT's auger by customers and prospective customers.

29.   In discussing CAT's auger on the Morris website, Morris states:



10

30.    An actual CAT auger with "water flow reliefs" is shown below:



31.    Water does not only circulate around the shaft and through a narrow gap between the auger flights and the tank wall in CAT's auger chiller because water also passes through the "water flow reliefs." Thus, water does not back up, flow rates are not reduced, and cold water does not channel through the chiller without circulating around the individual birds as claimed by Morris. Morris's statements about CAT's auger therefore are false.

32.    Morris has also misrepresented the relative size of the openings of the *IntraGrill* auger and CAT's "water flow reliefs" in the comparative advertisement on Morris's website. Morris's depiction of the *IntraGrill* auger design falsely represents that the openings of the *IntraGrill* auger are much larger relative to the rest of the auger blade than in actuality. Conversely, Morris's depiction of the CAT auger falsely represents that CAT's "water flow reliefs" are much smaller relative to the rest of the auger blade than in actuality.

11

33.     A side-by-side comparison of an actual Morris *IntraGrill* auger (left) and Morris's depiction of an *IntraGrill* auger on its website (right) is show below:



34.     A side-by-side comparison of an actual CAT auger with "water flow reliefs" (left) and Morris's depiction of the CAT auger on its website (right) is shown below:



35.     In its depiction of the *IntraGrill* auger, Morris also represents that water can flow through the top openings of the *IntraGrill* auger.  However, because the top of the auger and the corresponding portion of the *IntraGrill* extend outside of the chiller tank, it is not possible for water to flow through the top openings as

depicted on Morris's website. Morris's representations about the water flow through the *IntraGrill* auger therefore are false.

36.     CAT notified Morris through its counsel in a letter dated June 17, 2015, that Morris's statements that the *IntraGrill* auger design was patented were false and misleading. The June 17, 2015, letter is attached as Exhibit D.

37.     Morris responded to CAT's complaints in a letter from its counsel dated July 30, 2015. In that letter, Morris stated that it intended to continue to represent its auger chiller as being patented, even though any reasonable inquiry would show that the *IntraGrill* auger is not patented under the '529 patent. The July 30, 2015, letter is attached as Exhibit E.

38.     Around August 2015, Morris revised its brochure on its auger chiller and *IntraGrill* auger. The August 2015 brochure is attached as Exhibit F. Despite being made aware of the false and misleading statements contained in the September 2014 version of the brochure, the same false and misleading statements are contained in the August 2015 version of the brochure.

39.     To date, Morris has failed to correct or remove any of the false and misleading statements about the *IntraGrill* auger in its marketing and advertising materials.

### B. COPE PRODUCT

40.     Morris issued a press release dated February 4, 2015, claiming that it had patented a new Continuous Online Pathogen Eliminator (COPE) product. The press release was posted on Morris's website on or about April 28, 2015, and bears

the headline "MORRIS AND ASSOCIATES PATENTS PATHOGEN
ELIMINATOR." The February 2015 press release is attached as Exhibit G.

41.     The press release states: "With FSIS regulations becoming more
stringent, Morris and Associates, a primary producer of poultry chilling equipment
in the United States and abroad, has patented a revolutionary parts chiller to
control pathogens in boneless and bone-in-parts."

42.     Upon information and belief, the COPE product is designed to be
positioned downstream of the poultry chiller in the processing line, and is used by
customers downstream of the poultry chiller, because the whole poultry carcasses
must be removed from the poultry chiller and cut into parts before entering the
COPE product for further decontamination.

43.     A description of the COPE product on Morris's website states:
"Exclusive, pathogen control innovation from Morris!"

44.     Morris's website also refers to the "patented COPE" and has included a
link to a marketing brochure on the COPE product. The COPE brochure is attached
as Exhibit H. The brochure includes statements in two separate places that the
COPE product is patented.

45.     The bottom of page 1 of the brochure states: "COPE Pats. 7,470,173
and 7,588,489." U.S. Patent No. 7,470,173 ("the '173 patent") was issued by the
United States Patent and Trademark Office on December 30, 2008, and U.S. Patent
No. 7,588,489 ("the '489 patent") was issued on September 15, 2009. The '173
patent is attached as Exhibit I and the '489 patent is attached as Exhibit J. Upon

information and belief, the COPE product was not developed by Morris until 2014 or 2015.

46.     The '173 patent and '489 patent describe and claim a decontamination tank for poultry carcasses that is positioned adjacent the bird delivery end of a poultry chiller, such as an auger chiller. The decontamination tank contains a much stronger concentration of antimicrobial agents than in an auger chiller and, as a result, the residence time of the poultry carcasses in the decontamination tank must be much shorter. The decontamination tank is designed to serve as the final decontamination step during processing of poultry carcasses.

47.     The '173 patent includes three independent claims: claim 1, claim 7, and claim 17.

48.     Claim 1 of the '173 claims:

A post chill decontamination tank assembly for positioning at a carcass discharge end of a poultry chiller that has a liquid capacity for chilling poultry carcasses and for containing a liquid solution of water and chemicals in a chemical concentration for reducing the contamination of the poultry carcasses as the poultry carcasses pass through the chiller, said post chill decontamination tank assembly comprising:

a tank for receiving the poultry carcasses from the poultry chiller, said tank including an upright entrance wall, an upright exit wall opposed to said entrance wall, and a semicylindrical perimeter wall extending between said entrance wall and said exit wall and defining a chamber for containing a decontamination solution, said chamber having a smaller liquid capacity than the liquid capacity of said poultry chiller for containing the decontamination solution, said decontamination solution having a different composition than the liquid solution in the chiller such that the decontamination solution in said chamber has more rapid antimicrobial effect than the liquid

15

solution in said chiller for further reducing the microbial contamination on the surfaces of the poultry carcasses,

said tank including an upwardly positioned opening, an entrance space in said chamber adjacent said entrance wall and below said opening for receiving poultry carcasses from the poultry chiller into the chamber, and a discharge space in said chamber adjacent said exit wall,

a paddle assembly including a plurality of paddles mounted in said discharge space about a central axis and extending adjacent said exit wall and positioned at different angles about the central axis,

power means connected to said paddle assembly for revolving said plurality of paddles in unison about the central axis in said tank,

said paddles each including a wiping edge adjacent the exit wall of said tank and a face sloped away from the wiping edge toward the entrance wall of said tank and configured for gathering poultry carcasses against the exit wall and lifting the poultry carcasses through the decontamination solution and out of the tank as the plurality of paddles revolve in said tank.

49.  Claim 7 of the '173 patent claims:

A post chill decontamination tank assembly for treating and reducing microbial contamination of poultry carcasses received from a poultry chiller, the poultry chiller having a liquid capacity for chilling poultry carcasses and for containing a liquid solution of water and chemicals in a chemical concentration for reducing the contamination of the poultry carcasses in which the poultry carcasses were immersed as the poultry carcasses pass through the chiller, said post chill decontamination tank assembly comprising:

a tank having a smaller liquid capacity than the liquid capacity of the poultry chiller for holding an antimicrobial bearing liquid of different content than the liquid solution in the poultry chiller, for further reducing the microbial contamination on the surfaces of the poultry carcasses, said tank including upper opening means for

16

receiving the poultry carcasses in said tank and for discharging the poultry carcasses from said tank,

a plurality of paddles mounted in said tank about a central axis within said tank and extending at different angles about the central axis,

power means connected to said plurality of paddles for revolving said plurality of paddles about the central axis in said tank and in sequence past the opening means of said tank for urging poultry carcasses in sequence about said tank and toward the opening means, and

said paddles each being sloped toward the opening means when reaching the opening means for urging the carcasses out of the said tank.

50.     Claim 17 of the '173 patent claims:

A process of reducing contamination on the surfaces of poultry carcasses that have been moved through a liquid chiller containing an antimicrobial liquid solution for reducing the contamination on the poultry carcasses, comprising:

moving the poultry carcasses out of the liquid chiller and into a post chill decontamination tank having a smaller liquid capacity than the liquid capacity of the poultry chiller and filled with liquid containing antimicrobial agents of a different composition than the liquid in the liquid chiller such that the liquid in said tank has more aggressive anti-microbial effect than the liquid in said chiller,

revolving a paddle assembly about a central axis in the tank with the paddles of the paddle assembly arranged at substantially equal angles from each other about the central axis, and

engaging the poultry carcasses with the paddles substantially in the sequence that the poultry carcasses were received in the tank, and moving said carcasses through an arcuate path through the liquid and upwardly above the liquid and out of the tank.

51.    The '489 patent includes five independent claims: claim 1, claim 10, claim 11, claim 16, and claim 20.

52.    Claim 1 of the '489 patent claims:

A post chill decontamination tank assembly for decontaminating poultry carcasses for positioning at a carcass discharge end of a poultry chiller, said post chill decontamination tank assembly comprising:

a tank for receiving the poultry carcasses from the poultry chiller, said tank including an entrance wall, an exit wall opposed to said entrance wall, and a semicylindrical perimeter wall extending between said entrance wall and said exit wall and defining a chamber for containing a decontamination solution,

said tank including a partition positioned between said entrance wall and said exit wall dividing said tank into a bird entrance chamber and a paddle chamber,

said partition including a lower edge positioned above the lower portion of said tank to allow the poultry carcasses to pass from said entrance chamber to said paddle chamber,

an upwardly positioned opening means including an entrance space for receiving the poultry carcasses from the poultry chiller into said bird entrance chamber of said tank and a discharge space for discharging the poultry carcasses from said paddle chamber,

a paddle assembly including a plurality of paddles mounted in said paddle chamber about a central axis and positioned at different angles about the central axis,

power means connected to said paddle assembly for revolving said plurality of paddles in unison about the central axis in said tank,

said paddles configured for gathering the poultry carcasses in said paddle chamber and discharging the gathered poultry carcasses from said paddle chamber as said plurality of paddles revolve in said tank.

53.    Claim 10 of the '489 patent claims:

A    post    chill    decontamination    tank    assembly    for decontaminating poultry carcasses received from a poultry chiller in which the poultry carcasses were immersed in an antimicrobial-bearing liquid, said post chill decontamination tank assembly comprising:

a tank of smaller liquid capacity than said poultry chiller for holding liquid, said tank including a substantially flat exit wall and a semicircular perimeter side wall, upper opening means for receiving the poultry carcasses in said tank and for discharging the poultry carcasses from said tank,

means connected to said tank for supplying to said tank an antimicrobial-bearing liquid of different antimicrobial content than the liquid in the poultry chiller,

a plurality of paddles mounted in said tank and displaced radially outwardly from a central axis within said tank and movable in sequence adjacent said exit wall about said upper opening means for discharging the poultry carcasses from said tank,

said paddies each including a substantially rectilinear edge arranged to move in close proximity to said exit wall and oriented to pass said opening means with said rectilinear edge oriented substantially horizontally and the paddle sloped toward said opening means for moving the poultry carcasses through said opening means,

power means connected to said plurality of paddles for revolving said plurality of paddles about the central axis in said tank and in sequence past the opening means of the tank for urging poultry carcasses in sequence about the tank and toward the opening means.

54.    Claim 11 of the '489 patent claims:

A post chill decontamination tank assembly for positioning at a carcass discharge end of a poultry chiller that contains a liquid solution for decontaminating poultry carcasses, said post chill decontamination tank assembly comprising:

19

a tank for receiving the poultry carcasses from the poultry chiller, said tank including an entrance wall, an exit wall opposed to said entrance wall, and a perimeter wall extending between said entrance wall and said exit wall and defining a chamber for containing a decontamination solution,

said tank including an upwardly positioned opening and an entrance space for receiving poultry carcasses from the poultry chiller into the tank and a discharge space for discharging the poultry carcasses from the tank,

a paddle assembly including a plurality of paddles mounted in said chamber about a central axis within said chamber and positioned at different angles about the central axis,

power means connected to said paddle assembly for revolving said plurality of paddles in unison about the central axis in said tank,

said paddles configured for gathering poultry carcasses as the plurality of paddles revolve in said tank,

a partition in said tank adjacent said plurality of paddles and forming in said tank an entrance chamber for receiving poultry carcasses,

the partition including a lower edge positioned above the lower portion of said tank to allow poultry carcasses to pass from the entrance chamber to the plurality of paddles, such that the poultry carcasses are received in the entrance chamber and contacted by the liquid in the tank before being engaged by the paddles.

55.   Claim 16 of the '489 patent claims:

A process of decontaminating poultry carcasses that have been moved through a liquid chiller containing a liquid solution for decontaminating the poultry carcasses, comprising:

moving the poultry carcasses out of the liquid chiller and into an entrance chamber of a post chill decontamination tank filled with a decontamination solution different than the liquid in the liquid chiller,

revolving a paddle assembly about a central axis in the tank with the paddles of the paddle assembly arranged at substantially equal angles from each other about the central axis,

moving the poultry carcasses from the entrance chamber beneath a partition in the tank and toward the paddles,

engaging and moving the poultry carcasses with the paddles through the liquid upwardly above the liquid and out of the tank.

56.   Claim 20 of the '489 patent claims:

A post chill decontamination tank assembly for positioning at a carcass discharge end of a poultry chiller and for decontaminating poultry carcasses, said post chill decontamination tank assembly comprising:

a tank for receiving the poultry carcasses from the poultry chiller, said tank including an entrance wall, an exit wall opposed to said entrance wall, and a perimeter wall extending between said entrance wall and said exit wall and defining a chamber for containing a decontamination solution,

said tank including a partition positioned between said entrance wall and said exit wall and dividing said tank into a bird entrance chamber and a paddle chamber, and an upwardly positioned opening means for receiving poultry carcasses from the poultry chiller into said bird entrance chamber and for discharging the poultry carcasses from said paddle chamber,

a paddle assembly including a plurality of paddles mounted in said paddle chamber about a central axis within said paddle chamber and positioned at different angles about the central axis,

power means connected to said paddle assembly for revolving said plurality of paddles in unison about the central axis in said paddle chamber,

said paddles configured for gathering poultry carcasses as the plurality of paddles revolve in said tank.

57.     During the prosecution of the applications that led to issuance of the '173 patent and '489 patent, Morris stated to the U.S. Patent and Trademark Office: "All of applicants' independent claims describe a post chill decontamination tank assembly *positioned adjacent the bird delivery end* of a poultry chiller." (Emphasis added).

58.     By making this unequivocal statement concerning the relative position of the poultry chiller and the decontamination tank, the scope of Morris's protection under the '173 patent and '489 patent is limited to a post chill decontamination tank positioned adjacent the bird delivery end of a poultry chiller.

59.     In addition, in an earlier litigation concerning the '173 patent, Morris explained that "[t]he '173 patent overcomes these problems [of bacterial contamination] with a small post chill decontamination tank *placed at the discharge end of the chiller* so that birds enter the post chill decontamination tank after exiting the chiller." (Emphasis added).  Thus, Morris admitted that the '173 patent covers a post chill decontamination tank positioned at the exit end of a chiller in a poultry processing line.

60.     By making these statements during the earlier litigation, Morris acknowledged and admitted that the '173 patent requires that the post chill decontamination tank be positioned at the exit end of a poultry chiller.

61.     The COPE product is not covered by any of the claims of the '173
patent or the '489 patent because the COPE product is not intended to be positioned
at a carcass discharge end or exit end of a poultry chiller and, upon information and
belief, is not used by customers at a carcass discharge end or exit end of a poultry
chiller.  The COPE product also is not covered by the '173 patent or the '489 patent
at least because the COPE product does not receive poultry carcasses directly from
a poultry chiller and the COPE product does not decontaminate whole poultry
carcasses.

62.     Morris's statements that the COPE product is patented therefore are
false.

63.     CAT notified Morris through its counsel in a letter dated June 17,
2015, that Morris's statements that the COPE product was patented were false and
misleading.  The July 17, 2015, letter is attached as Exhibit D.

64.     Morris responded to CAT's complaints in a letter from its counsel
dated July 30, 2015.  In that letter, Morris stated that it intended to continue to
represent its COPE product as being patented, even though any reasonable inquiry
would show that the COPE product is not patented under either the '173 patent or
the '489 patent.  The July 30, 2015 letter is attached as Exhibit E.

65.     In early August 2015, Morris issued yet another press release
regarding the COPE product.  The headline on the page of Morris's website that
includes a link to the August 2015 press release states: "Morris & Associates Patent
Pathogen Eliminator."  The new press release includes three references to the

COPE product being patented.  The August 2015 press release is attached as Exhibit K.

66.     Thus, not only has Morris failed to correct its statements in its marketing and advertising materials that the COPE product is patented, but it has issued new marketing and advertising materials including the same or similar false and misleading statements regarding the COPE product after being informed that those statements are false.

## C.  CAUSES OF ACTION

### COUNT I — UNFAIR COMPETITION UNDER 15 U.S.C. § 1125

67.     CAT adopts, realleges and incorporates all of the allegations and facts stated in Paragraphs 1-66 of this Complaint.

68.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, provides that: "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's

goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

69.    Morris has falsely represented and continues to falsely represent in commercial advertising and promotion on its website and in marketing brochures that its *IntraGrill* auger is patented. Morris therefore has misrepresented and continues to misrepresent the nature, characteristics, and qualities of its augers and auger chillers. Morris's statements that its *IntraGrill* auger is patented are literally false.

70.    By making these false and misleading statements, Morris has deceived and/or is likely to deceive CAT and Morris's mutual customers and prospective customers into believing that the *IntraGrill* auger or certain features of the *IntraGrill* auger are unique to Morris and may only be manufactured, sold, and utilized by Morris.

71.    Morris's false and misleading statements about its *IntraGrill* auger were intended to deter and have deterred CAT and Morris's mutual customers and prospective customers from considering CAT and its products when making auger chiller purchasing decisions because of the fear of being sued by Morris for patent infringement.

72.    Morris has falsely represented and continues to falsely represent in commercial advertising and promotion on its website the relative size of the *IntraGrill* openings in Morris augers and the "water flow reliefs" in CAT augers. Morris has also falsely represented and continues to falsely represent in commercial

advertising and promotion on its website the water flow exhibited in a Morris chiller by virtue of the *IntraGrill* openings and the water flow exhibited in a CAT chiller with "water flow reliefs" in the auger. Morris therefore has misrepresented and continues to misrepresent the nature, characteristics, and qualities of Morris augers and auger chillers and CAT augers and auger chillers. Morris's statements are literally false.

73.     By making these false and misleading statements, Morris has deceived and/or is likely to deceive CAT's and Morris's mutual customers and prospective customers into believing that water circulates only around the shaft and through a narrow gap between the auger and the tank wall in the CAT auger chiller. Morris has also deceived and/or is likely to deceive CAT and Morris's mutual customers and prospective customers into believing that Morris's *IntraGrill* openings are much larger than they actually are and that CAT's "water flow reliefs" are much smaller than they actually are.

74.     Morris's false and misleading statements about the water flow exhibited in CAT and Morris auger chillers and the relative size of the *IntraGrill* openings and "water flow reliefs" are intended to deter and have deterred CAT and Morris's mutual customers and prospective customers from considering CAT and its products when making auger chiller purchasing decisions because Morris has tricked customers into believing that water in the CAT chiller is not capable of flowing through the faces of the CAT auger or that water flows through the faces of the CAT auger to a much less extent than in actuality.

75.    Morris has falsely represented and continues to falsely represent in commercial advertising and promotion on its website and in marketing brochures that its COPE product is patented.  Morris therefore has misrepresented and continues to misrepresent the nature, characteristics, and qualities of its COPE product.  Morris's statements that its COPE product is patented are literally false.

76.    By making these false and misleading statements, Morris has deceived and/or is likely to deceive CAT and Morris's mutual customers and prospective customers into believing that the COPE product or certain features or applications of the COPE product are unique to Morris and may only be manufactured, sold and utilized by Morris.  Morris's false and misleading statements were intended to deter and have deterred CAT and Morris's mutual customers and prospective customers from considering CAT and its products when making purchasing decisions on poultry processing equipment because of the fear of being sued by Morris for patent infringement.

77.    Morris's false and misleading statements about the *IntraGrill* auger, the COPE product, and CAT's chiller are material because whether a particular piece of poultry processing equipment or a particular feature of that equipment is patented influences purchasing decisions of poultry processing companies.  In addition, how poultry processing equipment functions and the advantages and disadvantages of that equipment also influence purchasing decisions of poultry processing companies.

78.     Morris has been aware of these false and misleading statements about the *IntraGrill* auger and the COPE product since at least June 17, 2015. Despite full knowledge that these statements were false and misleading, Morris has continued its false advertising campaign. Morris's false statements therefore have been made willfully and in bad faith.

79.     Morris's false statements and misrepresentations have injured and/or are likely to injure CAT, including through a diversion of sales and loss of goodwill, because CAT and Morris are the only two poultry chiller manufacturers in the United States. As a result, any sale by Morris is a lost sale by CAT. By advertising that Morris's products are patented when they are not, customers believe or are likely to believe that Morris and its products are superior and more innovative than CAT and its products because they have been "approved" by the federal government, which regulates the poultry processing industry. In addition, because CAT and Morris are the only two options in the poultry chiller market, CAT and its products have been devalued in the minds of poultry processing companies because Morris has deceived them into holding Morris's products in higher regard by virtue of being patented. CAT therefore has lost or is likely to lose goodwill associated with its business and its products. CAT's stellar reputation that it has developed through almost two decades in the poultry processing equipment industry has also been damaged or is likely to be damaged as a result of Morris's false statements. In addition, upon information and belief, CAT and Morris's mutual customers and prospective customers have been reluctant to purchase and, in some instances, have

declined to purchase CAT's chillers or certain parts of CAT's chillers as a result of Morris's false advertising. CAT thus has been injured and is likely to continue to be injured because of Morris's false statements.

80.     CAT has suffered actual damages as a result of Morris's actions and is entitled to recover those damages from Morris. CAT is also entitled to a disgorgement of profits, treble damages, and a recovery of its attorneys' fees from Morris.

81.     Morris's false advertising has caused and will continue to cause CAT irreparable harm for which it has no adequate remedy at law unless Morris's false advertising efforts are enjoined by this Court.

### COUNT II — ARKANSAS COMMON LAW UNFAIR COMPETITION

82.     CAT adopts, realleges and incorporates all of the allegations and facts stated in Paragraphs 1-81 of this Complaint.

83.     Morris has falsely represented and continues to falsely represent in commercial advertising and promotion on its website and in marketing brochures that its *IntraGrill* auger is patented. Morris therefore has misrepresented and continues to misrepresent the nature, characteristics, and qualities of its augers and auger chillers. Morris's statements that its *IntraGrill* auger is patented are literally false.

84.     By making these statements, Morris has deceived and/or is likely to deceive CAT and Morris's mutual customers and prospective customers into

29

believing that the *IntraGrill* auger or certain features of the *IntraGrill* auger are unique to Morris and may only be manufactured, sold, and utilized by Morris.

85.     Morris's false and misleading statements about its *IntraGrill* auger were intended to deter and have deterred CAT and Morris's mutual customers and prospective customers from considering CAT and its products when making auger chiller purchasing decisions because of the fear of being sued by Morris for patent infringement.

86.     Morris has falsely represented and continues to falsely represent in commercial advertising and promotion on its website the relative size of the *IntraGrill* openings in Morris augers and the "water flow reliefs" in CAT augers. Morris has also falsely represented and continues to falsely represent in commercial advertising and promotion on its website the water flow exhibited in a Morris chiller by virtue of the *IntraGrill* openings and the water flow exhibited in a CAT chiller with "water flow reliefs" in the auger. Morris therefore has misrepresented and continues to misrepresent the nature, characteristics, and qualities of Morris augers and auger chillers and CAT augers and auger chillers. Morris's statements are literally false.

87.     By making these false statements, Morris has deceived and/or is likely to deceive CAT's and Morris's mutual customers and prospective customers into believing that water circulates only around the shaft and through a narrow gap between the auger and the tank wall in the CAT auger chiller. Morris has also deceived and/or is likely to deceive CAT's and Morris's mutual customers and

prospective customers into believing that Morris's *IntraGrill* openings are much larger than they actually are and that CAT's "water flow reliefs" are much smaller than they actually are.

88.    Morris's false and misleading statements about the water flow exhibited in CAT and Morris auger chillers and the relative size of the *IntraGrill* openings and "water flow reliefs" are intended to deter and have deterred CAT's and Morris's mutual customers and prospective customers from considering CAT and its products when making auger chiller purchasing decisions because Morris has tricked customers into believing that water in the CAT chiller is not capable of flowing through the faces of the auger or that water flows through the faces of the CAT auger to much less of an extent that in actuality.

89.    Morris has falsely represented and continues to falsely represent in commercial advertising and promotion on its website and in marketing brochures that its COPE product is patented.  Morris therefore has misrepresented and continues to misrepresent the nature, characteristics, and qualities of its COPE product.  Morris's statements that its COPE product is patented are literally false.

90.    By making these false and misleading statements, Morris has deceived and/or is likely to deceive CAT's and Morris's mutual customers and prospective customers into believing that the COPE product or certain features or applications of the COPE product are unique to Morris and may only be manufactured, sold, and utilized by Morris.  Morris's false and misleading statements were intended to deter and have deterred CAT's and Morris's mutual customers and prospective customers

from considering CAT and its products when making purchasing decisions on poultry processing equipment because of the fear of being sued by Morris for patent infringement.

91.     Morris's false and misleading statements about the *IntraGrill* auger, the COPE product, and CAT's chiller are material because whether a particular piece of poultry processing equipment or a particular feature of that equipment is patented influences purchasing decisions of poultry processing companies. In addition, how poultry processing equipment functions and the advantages and disadvantages of that equipment also influence purchasing decisions of poultry processing companies.

92.     Morris has been aware of these false and misleading statements about the *IntraGrill* auger and the COPE product since at least June 17, 2015. Despite full knowledge that these statements were false and misleading, Morris has continued its false advertising campaign. Morris's false statements therefore have been made willfully and in bad faith.

93.     Morris's false statements and misrepresentations have injured and/or are likely to injure CAT, including through a diversion of sales and loss of goodwill, because CAT and Morris are the only two poultry chiller manufacturers in the United States. As a result, any sale by Morris is a lost sale by CAT. By advertising that Morris's products are patented when they are not, customers believe or are likely to believe that Morris and its products are superior and more innovative than CAT and its products because they have been "approved" by the federal

government, which regulates the poultry processing industry. In addition, because CAT and Morris are the only two options in the poultry chiller market, CAT and its products have been devalued in the minds of poultry processing companies because Morris has deceived them into holding Morris's products in higher regard by virtue of being patented. CAT therefore has lost or is likely to lose goodwill associated with its business and its products. CAT's stellar reputation that it has developed through almost two decades in the poultry processing equipment industry has also been damaged or is likely to be damaged as a result of Morris's false statements. In addition, upon information and belief, CAT's and Morris's mutual customers and prospective customers have been reluctant to purchase and, in some instances, have declined to purchase CAT's chillers or certain parts of CAT's chillers as a result of Morris's false advertising. CAT thus has been injured and is likely to continue to be injured because of Morris's false statements.

94.     CAT has suffered actual damages as a result of Morris's actions and is entitled to recover those damages from Morris.

95.     Morris knew or ought to have known that its conduct would naturally and probably result in injury or damage to CAT and Morris continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred, because Morris's advertising was literally false, directed towards CAT and its products, and CAT and Morris are the only two companies in this market. CAT therefore is entitled to punitive damages.

96.     Morris intentionally engaged in false advertising for purposes of causing injury or damage to CAT and gain for itself because Morris's advertising was literally false, directed towards CAT and its products, and CAT and Morris are the only two companies in this market.  CAT therefore is entitled to punitive damages.

### COUNT III — FALSE PATENT MARKING UNDER 35 U.S.C. § 292(b)

97.     CAT adopts, realleges and incorporates all of the allegations and facts stated in Paragraphs 1-96 of this Complaint.

98.     Section 292 of the Patent Act, 35 U.S.C. § 292(a), provides that "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented, for the purposes of deceiving the public" is liable for false patent marking.

99.     Section 292(b) provides that: "A person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury."

100.    Morris has falsely marked and continues to falsely mark in commercial advertising and promotion on its website and in marketing brochures that its *IntraGrill* auger design is patented.  Morris's statements that its *IntraGrill* auger is patented are literally false.

34

101.    Upon information and belief, Morris has also falsely marked and continues to false mark the Morris chiller with the *IntraGrill* auger by physically labeling the chiller with the patent number for the '529 patent.

102.    Morris's false marking concerning the *IntraGrill* auger is intended to deceive and has deceived CAT's and Morris's mutual customers and prospective customers into believing that the *IntraGrill* auger or certain features of the *IntraGrill* auger are unique to Morris and may only be manufactured, sold and utilized by Morris. Morris's false marking has deterred CAT's and Morris's mutual customers and prospective customers from purchasing CAT's auger chillers or certain parts of CAT's chillers because of the fear of being sued by Morris for patent infringement. Upon information and belief, CAT's and Morris's mutual customers and prospective customers have been reluctant to purchase and, in some instances, have declined to purchase, CAT's chillers or certain parts of CAT's chillers as a result of Morris's false marking. CAT therefore has suffered a competitive injury and is likely to continue to be injured as a result of Morris's false marking.

103.    Morris has falsely marked and continues to falsely mark in commercial advertising and promotion on its website and in marketing brochures that its COPE product is patented. Morris's statements that its COPE product is patented are literally false.

104.    Upon information and belief, Morris has also falsely marked and continues to false mark the COPE product by physically labeling the COPE product with the patent numbers for the '173 patent and '489 patent.

35

105.   In a lawsuit filed in 2009 in the United States District Court for the Eastern District of North Carolina ("the North Carolina district court"), Morris alleged that CAT's "KillCAT" product infringed the '173 patent. The "KillCAT" product was a poultry pathogen reduction product. The "KillCAT" product was designed to be positioned at the end of an auger chiller to allow whole poultry carcasses to move directly from the auger chiller into the "KillCAT" product for final decontamination treatment of the carcasses.

106.   On August 11, 2011, Morris filed a second lawsuit in the United States District Court for the Eastern District of North Carolina for infringement of the '173 patent. The second suit was filed against one of CAT's and Morris's mutual customers, Perdue Farms Incorporated ("Perdue"). Morris alleged that Perdue infringed the '173 patent as a result of Perdue's use of KillCAT products sold to it by CAT.

107.   On December 19, 2011, the North Carolina district court entered an Injunction Order restraining and enjoining CAT "from making, using, offering to sell, selling, or importing into the United States its KillCAT pathogen reduction product" or "another product that infringes claims 1, 2, 5-10, 12, and 17 of the '173 Patent ...." The Injunction Order further states that "nothing in this Order should be construed as to prohibit CAT from manufacturing, selling, or offering for sale any product or device, whether under the trademark or brand 'KillCAT' or otherwise, so long as that product or device does not directly or indirectly infringe the Infringed Claims in violation of this Injunction Order."

108.    Even though Morris has at all times known that the COPE product is not covered under the '173 patent or '489 patent, Morris nevertheless decided to falsely mark the COPE product as being patented to gain a competitive advantage over CAT as its only competitor. Morris's false marking was intended to deter CAT from making, offering for sale, and selling a competing poultry parts chiller, such as a product similar to CAT's previous "KillCAT" product, even though such a CAT product would not infringe the '173 patent or the '489 patent. By marking the COPE product as being patented under the '173 patent, Morris is signaling to CAT that it believes that CAT cannot make the same product or a similar product without violating the Injunction Order entered by the North Carolina district court.

109.    At least one customer has sought to purchase a poultry parts chiller from CAT that is similar to Morris's COPE product. Because of Morris's false marking, CAT was forced to decline to sell the customer the poultry parts chiller because of the fear of Morris moving the North Carolina district court to hold CAT in contempt for violating the Injunction Order. As a result of Morris's false marking and improper use of the Injunction Order to its competitive advantage, CAT has suffered a competitive injury. Had Morris not falsely marked its COPE product as being patented, CAT would have marketed, offered for sale, and sold a poultry parts chiller similar to Morris's COPE product. In addition, upon information and belief, if Morris had not falsely marked its COPE product and CAT had been able to offer for sale a poultry parts chiller without the threat of being held in contempt, a

portion of the sales of the COPE product made by Morris would have instead been made by CAT.

110.   In addition to improperly leveraging the Injunction Order to deter rightful and fair competition by CAT, Morris's false marking is intended to deceive and has deceived CAT's and Morris's mutual customers and prospective customers into believing that the COPE product or certain features or applications of the COPE product are unique to Morris and may only be manufactured, sold, and utilized by Morris.  Morris's false marking has deterred some of CAT's and Morris's mutual customers and prospective customers from considering CAT and its products when making purchasing decisions on poultry processing equipment because of the fear of being sued by Morris for patent infringement, just as Morris did against Perdue in 2011 for alleged infringement of the '173 patent.  CAT therefore has suffered a competitive injury as a result of Morris's false marking.

111.   In addition, Morris's false marking has injured and will continue to injure CAT through a loss of goodwill because CAT and Morris are the only two poultry chiller manufacturers in the United States.  By advertising that Morris's products are patented when they are not, customers believe or are likely to believe that Morris and its products are superior and more innovative than CAT and its products because they have been "approved" by the federal government, which regulates the poultry processing industry.  In addition, because CAT and Morris are the only two options in the poultry chiller market, CAT's products have been devalued in the minds of poultry processing companies because Morris has deceived

them into holding Morris's products in higher regard by virtue of being patented. CAT therefore has lost or is likely to lose goodwill associated with its business and its products. CAT's stellar reputation that it has developed though almost two decades in the poultry processing equipment industry has been damaged or is likely to be damaged as a result of Morris's false marking. CAT thus has suffered a competitive injury and is likely to continue to suffer a competitive injury because of Morris's false marking.

112. CAT has suffered actual damages as a result of Morris's actions and is entitled to recover those damages from Morris.

113. Morris has been aware of the false marking of the *IntraGrill* auger and the COPE product since at least June 17, 2015. Despite full knowledge of its unlawful false marking, Morris has continued its false marking campaign. Morris's false marking therefore have been made willfully and in bad faith.

## COUNT IV — ARKANSAS DECEPTIVE TRADE PRACTICES ACT

114. CAT adopts, realleges and incorporates all of the allegations and facts stated in Paragraphs 1-113 of this Complaint.

115. The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-107, provides that deceptive and unconscionable trade practices are unlawful and prohibited, including the following: "[k]nowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model;" "[d]isparaging the

goods, services, or business of another by false or misleading representation of fact;" and "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade."

116.   Section 4-88-108 provides: "When utilized in connection with the sale or advertisement of any goods, services, or charitable solicitation, the following shall be unlawful: (1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."

117.   Morris has falsely represented and continues to falsely represent in commercial advertising and promotion on its website and in marketing brochures that its *IntraGrill* auger is patented.  Morris therefore has misrepresented and continues to misrepresent the nature, characteristics, qualities, sponsorship, approval, and certification of its augers and auger chillers.

118.   By making these false statements, Morris has deceived and/or is likely to deceive CAT's and Morris's mutual customers and prospective customers into believing that the *IntraGrill* auger or certain features of the *IntraGrill* auger are unique to Morris and may only be manufactured, sold, and utilized by Morris. These statements were specifically intended to deter and have deterred CAT's and Morris's mutual customers and prospective customers from considering CAT and its products when making auger chiller purchasing decisions because of the fear of being sued by Morris for patent infringement.

119.   Morris has falsely represented and continues to falsely represent in commercial advertising and promotion on its website the relative size of the *IntraGrill* openings in Morris augers and the "water flow reliefs" in CAT augers. Morris has also falsely represented and continues to falsely represent in commercial advertising and promotion on its website the water flow exhibited in a Morris chiller by virtue of the *IntraGrill* openings and the water flow exhibited in a CAT chiller with "water flow reliefs" in the auger. Morris therefore has misrepresented and continues to misrepresent the nature, characteristics, and qualities of Morris augers and auger chillers, and CAT augers and auger chillers. Morris's statements are literally false.

120.   By making these false and misleading statements, Morris has deceived and/or is likely to deceive CAT's and Morris's mutual customers and prospective customers into believing that water circulates only around the shaft and through a narrow gap between the auger and the tank wall in the CAT auger chiller. Morris has also deceived and/or is likely to deceive CAT's and Morris's mutual customers and prospective customers into believing that Morris's *IntraGrill* openings are much larger than they actually are and that CAT's "water flow reliefs" are much smaller than they actually are.

121.   Morris's false and misleading statements about the water flow exhibited in CAT and Morris auger chillers and the relative size of the *IntraGrill* openings and "water flow reliefs" are intended to deter and have deterred CAT's and Morris's mutual customers and prospective customers from considering CAT and its

41

products when making auger chiller purchasing decisions because Morris has
tricked customers into believing that water in the CAT chiller is not capable of
flowing through the faces of the CAT auger or that the water flows through the
faces of the CAT auger to a much less extent than in actuality.

122.    Morris has falsely represented and continues to falsely represent in
commercial advertising and promotion on its website and in marketing brochures
that its COPE product is patented.  Morris therefore has misrepresented and
continues to misrepresent the nature, characteristics, qualities, sponsorship,
approval, and certification of its COPE product.

123.    By making these false and misleading statements, Morris has deceived
and/or is likely to deceive CAT's and Morris's mutual customers and prospective
customers into believing that the COPE product or certain features or applications
of the COPE product are unique to Morris and may only be manufactured, sold, and
utilized by Morris.  These statements were specifically intended to deter and have
deterred CAT's and Morris's mutual customers and prospective customers from
considering CAT and its products when making purchasing decisions on poultry
processing equipment because of the fear of being sued by Morris for patent
infringement.

124.    Morris's false and misleading statements about the *IntraGrill* auger,
the COPE product, and CAT's chiller are material because whether a particular
piece of poultry processing equipment or a particular feature of that equipment is
patented influences purchasing decisions of poultry processing companies.  In

42

addition, how poultry processing equipment functions and the advantages and disadvantages of that equipment also influence purchasing decisions of poultry processing companies.

125. Morris has been aware of these false representations about the *IntraGrill* auger design and the COPE product since at least June 17, 2015. Despite full knowledge that these statements were false, Morris has continued its false advertising campaign. Morris's false statements therefore have been made willfully and in bad faith.

126. Morris's false statements and misrepresentations have injured and/or are likely to injure CAT, including through a diversion of sales and loss of goodwill, because CAT and Morris are the only two poultry chiller manufacturers in the United States. As a result, any sale by Morris is a lost sale by CAT. By advertising that Morris's products are patented when they are not, customers believe or are likely to believe that Morris and its products are superior and more innovative than CAT and its products because they have been "approved" by the federal government, which regulates the poultry processing industry. In addition, because CAT and Morris are the only two options in the poultry chiller market, CAT and its products have been devalued in the minds of poultry processing companies because Morris has deceived them into holding Morris's products in higher regard by virtue of being patented. CAT therefore has lost or is likely to lose goodwill associated with its business and its products. CAT's stellar reputation that it has developed through almost two decades in the poultry processing equipment industry has also

43

been damaged or is likely to be damaged as a result of Morris's false statements. In addition, upon information and belief, CAT's and Morris's mutual customers and prospective customers have been reluctant to purchase and, in some instances, have declined to purchase CAT's chillers or certain parts of CAT's chillers as a result of Morris's false advertising. CAT thus has been injured and is likely to continue to be injured because of Morris's false statements.

127.   CAT has suffered actual damages as a result of Morris's actions and is entitled to recover those damages from Morris. CAT is also entitled to recovery of its attorneys' fees from Morris.

## COUNT V — NORTH CAROLINA UNFAIR AND DECEPTIVE PRACTICES ACT

128.   CAT adopts, realleges and incorporates all of the allegations and facts stated in Paragraphs 1-127 of this Complaint.

129.   North Carolina Unfair and Deceptive Practices Act, N.C. Gen. Stat. § 75-1.1, provides that: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

130.   Morris has falsely represented and continues to falsely represent in commercial advertising and promotion on its website and in marketing brochures that its *IntraGrill* auger is patented. Morris therefore has misrepresented and continues to misrepresent the nature, characteristics, and qualities of its augers and auger chillers.

44

131.   By making these false and unfair statements, Morris has deceived and/or is likely to deceive CAT's and Morris's mutual customers and prospective customers into believing that the *IntraGrill* auger or certain features of the *IntraGrill* auger are unique to Morris and may only be manufactured and sold by Morris.  These statements were specifically intended to deter and have deterred CAT's and Morris's mutual customers and prospective customers from considering CAT and its products when making auger chiller purchasing decisions.

132.   Morris has falsely represented and continues to falsely represent in commercial advertising and promotion on its website the relative size of the *IntraGrill* openings in Morris augers and the "water flow reliefs" in CAT augers. Morris has also falsely represented and continues to falsely represent in commercial advertising and promotion on its website the water flow exhibited in a Morris chiller by virtue of the *IntraGrill* openings and the water flow exhibited in a CAT chiller with "water flow reliefs" in the auger.  Morris therefore has misrepresented and continues to misrepresent the nature, characteristics, and qualities of Morris augers and auger chillers, and CAT augers and auger chillers.  Morris's statements are literally false.

133.   By making these false and unfair statements, Morris has deceived and/or is likely to deceive CAT's and Morris's mutual customers and prospective customers into believing that water circulates only around the shaft and through a narrow gap between the auger and the tank wall in the CAT auger chiller.  Morris has also deceived and/or is likely to deceive CAT's and Morris's mutual customers

and prospective customers into believing that Morris's *IntraGrill* openings are much larger than they actually are and that CAT's "water flow reliefs" are much smaller than they actually are.

134.   Morris's false and unfair statements about the water flow exhibited in CAT and Morris auger chillers and the relative size of the *IntraGrill* openings and "water flow reliefs" are intended to deter and have deterred CAT's and Morris's mutual customers and prospective customers from considering CAT and its products when making auger chiller purchasing decisions because Morris has tricked customers into believing that water in the CAT chiller is not capable of flowing through the faces of the CAT auger or that water flows through the faces of the CAT auger to a much less extent than in actuality.

135.   Morris has falsely represented and continues to falsely represent in commercial advertising and promotion on its website and in marketing brochures that its COPE product is patented.  Morris therefore has misrepresented and continues to misrepresent the nature, characteristics, and qualities of its COPE product.

136.   By making these false and unfair statements, Morris has deceived and/or is likely to deceive CAT's and Morris's mutual customers and prospective customers into believing that the COPE product or certain features or applications of the COPE product are unique to Morris and may only be manufactured, sold, and utilized by Morris.  These statements were specifically intended to deter CAT's and

Morris's mutual customers and prospective customers from considering CAT and its products when making purchasing decisions on poultry processing equipment.

137.   Morris's false and misleading statements about the *IntraGrill* auger design, the COPE product, and CAT's chiller are material because whether a particular piece of poultry processing equipment or a particular feature of that equipment is patented influences purchasing decisions of poultry processing companies.  In addition, how poultry processing equipment functions and the advantages and disadvantages of that equipment also influence purchasing decisions of poultry processing companies.

138.   Morris has been aware of these false statements about the *IntraGrill* auger design and the COPE product since at least June 17, 2015.  Despite full knowledge that these statements were untrue, Morris has continued its false advertising campaign.  Morris's false statements therefore have been made willfully and in bad faith.

139.   Morris's false statements and misrepresentations have injured and/or are likely to injure CAT, including through a diversion of sales and loss of goodwill, because CAT and Morris are the only two poultry chiller manufacturers in the United States.  As a result, any sale by Morris is a lost sale by CAT.  By advertising that Morris's products are patented when they are not, customers believe or are likely to believe that Morris and its products are superior and more innovative than CAT and its products because they have been "approved" by the federal government, which regulates the poultry processing industry.  In addition, because

CAT and Morris are the only two options in the poultry chiller market, CAT and its products have been devalued in the minds of poultry processing companies because Morris has deceived them into holding Morris's products in higher regard by virtue of being patented. CAT therefore has lost or is likely to lose goodwill associated with its business and its products. CAT's stellar reputation that it has developed through almost two decades in the poultry processing equipment industry has also been damaged or is likely to be damaged as a result of Morris's false statements. In addition, upon information and belief, CAT's and Morris's mutual customers and prospective customers have been reluctant to purchase and, in some instances, have declined to purchase CAT's chillers or certain parts of CAT's chillers as a result of Morris's false advertising. CAT thus has been injured and is likely to continue to be injured because of Morris's false statements.

140.    CAT has suffered actual damages as a result of Morris's actions and is entitled to recover those damages from Morris. CAT is also entitled to treble damages and recovery of its attorneys' fees from Morris.

WHEREFORE, Plaintiff CAT prays for relief, as follows:

A.      An award of actual damages and Morris's profits under 15 U.S.C. § 1117 as a result of Morris's violation of 15 U.S.C. § 1125;

B.      An award of treble damages under 15 U.S.C. § 1117 as a result of Morris's violation of 15 U.S.C. § 1125;

C.      An order requiring Morris to engage in corrective advertising as a result of Morris's violation of 15 U.S.C. § 1125;

48

D.      An award of actual damages resulting from Morris's violation of Ark. Code Ann. § 4-88-107;

E.      An award of actual damages resulting from Morris's violation of N.C. Gen. Stat. § 75-1.1;

F.      An award of treble damages resulting from Morris's violation of  N.C. Gen. Stat. § 75-1.1;

G.      An award of actual damages resulting from Morris's violation of 35 U.S.C. § 292;

H.      An award of attorneys' fees pursuant to Ark. Code Ann. § 4-88-113;

I.      An award of attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1;

J.      A finding that this case is exceptional and an award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117;

K.      An award of punitive damages under Ark. Code. Ann. § 16-55-206;

L.      An award of costs and expenses;

M.      A preliminary and permanent injunction barring Morris from further false advertising; and

N.      Such further relief as this Court deems proper.

## JURY DEMAND

Plaintiff, Cooling & Applied Technology, Inc., hereby demands a trial by jury on all issues so triable.

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201
(501) 371-0808
FAX: (501) 376-9442
rglasgow@wlj.com; kwilson@wlj.com
sirby@wlj.com; bglasgow@wlj.com

By _Blake Glasgow_____
    Roger A. Glasgow (69027)
    Kyle R. Wilson (89118)
    Scott A. Irby (99192)
    Richard Blakely Glasgow (2009157)

    *Attorneys for Cooling & Applied
    Technology, Inc.*